CELESTINA ABARCA SANFELIZ, Plaintiff and Appellee, *v* HORACIO CORDERO, Defendant and Appellant.

No. 8513. Argued May 6, 1942.—Decided June 5, 1942.

Harry M. Besosa and *José López Baralt* for appellant. *R. Díaz Collazo* for appellee.

MR. JUSTICE SNYDER delivered the opinion of the court.

The plaintiff owns 13 Comercio St. in San Juan. This property faces on two streets. It is bounded on the north by Comercio St. and on the south by Pershing Ave. The Comercio St. portion of the building has two stories. The rest of the building, facing on the waterfront street known as Pershing Ave., consists of a one-story annex.

This is a suit for unlawful detainer. The district court entered judgment ousting the defendant from the first floor of the Comercio St. portion of the building and from the annex facing the waterfront. The defendant has appealed from that judgment.

In 1939 Horacio Cordero, the appellant, leased both portions of the property in question from Celestina Abarca, the appellee, by verbal contract on a month-to-month basis at a rental of $115.00 per month. In August or September, 1940, Alfonso Zacour became interested in subleasing the annex from Cordero in order to establish a night club on the waterfront. Cordero's rent at that time was in arrears. He saw Enrique Abarca, the appelleee's attorney-in-fact, and arranged to pay the back rent. At the same time he advised Abarca of his desire for a new lease for a fixed term. He explained that Zacour planned to spend considerable money on the annex, and therefore required a sublease for a fixed term. Abarca told Cordero and Zacour he was going to

continental United States, but would leave instructions with his attorney, Díaz Collazo, who would arrange everything.

Díaz Collazo worked out a new arrangement with Cordero whereby both portions of the property in question would be leased to the latter for two years, with an option to renew for two more years. Cordero was to pay $115.00 per month rental. Cordero had already made payment of part of the rent which had been in arrears under the month-to-month lease. The new arrangement provided for payment of the remaining $335.00 which was still in arrears by payment of $14.00 per month, in addition to the monthly rental, during the original two-year period of the new lease. It was also agreed that Cordero would furnish security for payment of the rent under the new lease, although there never was any precise arrangement as to the nature or amount of the security.

These terms were satisfactory to Zacour, as they would enable him to obtain a sublease of the annex for a fixed term from Cordero. But Zacour insisted on some sort of written agreement before actually entering the premises and making expenditures thereon of $7,000.00, which represented his entire capital. Díaz Collazo therefore drew a sublease which was executed by Cordero and Zacour on October 1, 1940, in which the annex was sub-leased to Zacour for one month, but in which Cordero obligated himself (a) to obtain from the proprietor a one-year lease with an option to renew for an additional year and (b) to sub-lease to Zacour for a similar fixed term.

Zacour and Cordero testified without contradiction that the sublease was drawn by Abarca's attorney in this manner because the written lease for both portions of the property in favor of Cordero for a fixed term could not be formally executed until Enrique Abarca's return to Puerto Rico. After the execution of this sublease on October 1, 1940, Zacour

went into possession of the annex and made extensive expenditures. Abarca returned to Puerto Rico while these expenditures on the annex were being made. Zacour immediately went to see Abarca and told him about the expenditures he was making. Zacour testified that Abarca told him that everything was arranged with Cordero, and that Cordero had a proper lease. Zacour further testified that both Díaz Collazo and Abarca, after the latter returned to Puerto Rico, told him that a written lease was not necessary, and that Cordero's lease for two years with an option to renew for two more years already existed. Zacour testified that after he was thus advised, he no longer insisted that Cordero sign any further sublease, and proceeded to spend the rest of his capital and to open the Carioca Night Club.

Zacour began to operate his night club. Cordero paid the stipulated rent of $115.00 per month, beginning November 1, 1940, for seven months, plus $14.00 per month as agreed for the arrears under the previous lease. In addition, prior to Abarca's return to Puerto Rico, Cordero went to Díaz Collazo and offered him the equivalent of two months rent in cash as the security required under the new lease. According to Díaz Collazo's own testimony, the latter suggested to Cordero that it would be more desirable from Cordero's point of view to furnish a mortgage on some property as security, thereby avoiding the immobilization of the cash money. Díaz Collazo and Cordero therefore agreed that the latter would send Díaz Collazo the deed to a piece of property belonging to the Succession Cordero in order that Díaz Collazo might prepare the necessary documents in connection with such a mortgage. Cordero sent the deed to Díaz Collazo, who thereafter advised Cordero in writing that certain death and birth certificates were necessary before the document of security could be put in proper form. The original deed remained in Díaz Collazo's possession, while Cordero took steps to secure such certificates.

Meanwhile, Abarca returned to Puerto Rico. The necessary birth and death certificates not having as yet been obtained, the mortgage which had been suggested as security was not formally executed. But Cordero or his sublessees continued in possession of the property without objection. And the rent of $115.00 plus $14.00 per month provided for in the new arrangement was paid by Cordero and accepted by Abarca for seven months.

On May 14, 1941, Abarca wrote Cordero that he had decided to make some alterations and requested that he order the evacuation of the first floor of the Comercio St. portion of the building so that it would be available by July 1 to effect these alterations. At that time the said portion of the building was actually in the possession of a sublessee of Cordero. Cordero testified that in response to the letter he ordered his sublessee to vacate the Comercio St. portion of the building. It was vacant for three days, during which time Abarca did nothing in connection with the alleged repairs. Cordero testified that after three days he learned that Abarca's letter was prompted by the latter's desire to obtain possession of this portion of the building in order to locate his new radio station there. Cordero testified that when he obtained this information, which the appellee concedes was correct, he made a new sublease of the Comercio St. portion of the building to another person. Cordero's sublessees, including Zacour, continued to occupy both the first floor of the Comercio St. portion of the building and the one-story annex. On July 15, 1941, the suit herein was filed, praying for ouster of Cordero from the whole building.

The district court entered judgment for the appellee, ousting the appellant from both the Comercio St. portion of the building and the annex in which the night club was located. In concluding that there was no lease between Abarca and Cordero for a fixed term, the lower court relied solely on the fact that "since the defendant never furnished the

guarantees that the plaintiff demanded to perfect it, the lease was never made". The court therefore concluded that the allegation that a lease for two years existed was "devoid of proof".

█ We are unable to agree with the district court that as a matter of law under the circumstances of this case no lease for two years existed. While Zacour is not a party to this suit, Díaz Collazo and Abarca fully understood that an essential feature of the new lease for Cordero was a provision for a fixed term which would enable him to sublease the annex to Zacour, who demanded a fixed term to justify his proposed expenditures on the property. And there is no dispute that Díaz Collazo was authorized to perfect all arrangements. The following testimony of Abarca indicates what Díaz Collazo had arranged:

"Q. Did you sign that contract when you returned from your trip?
A. No, sir.
Q. Why?
A. He never furnished the guarantee.
Q. Was the rent fixed?
A. Yes, sir.
Q. Were the other conditions fixed?
A. Yes, sir.
Q. What was the only reason why it did not culminate in a contract?
A. For lack of the guarantee."

Díaz Collazo himself testified to the same effect as follows:

"Naturally our client was interested in the contract also, and that contract was given to him under certain conditions. Among those conditions was one that he should offer a guarantee satisfactory to the proprietor."

The appellee's position, with which the lower court agreed, is predicated almost exclusively on the lack of a formally executed guarantee. But the undisputed testimony shows

that Cordero complied with the general condition that he furnish some sort of security. He can scarcely be held to account for the conduct of Díaz Collazo, who was fully authorized to act for the appellee, in dissuading him from furnishing a cash guarantee. Cordero carried out all of Díaz Collazo's suggestions with reference to the mortgage which was to serve as security. Indeed, the original deed to the property which was to be mortgaged is still in Díaz Collazo's possession, and the birth and death certificates which had been required by Díaz Collazo had been finally obtained and were introduced in evidence by the appellant at the trial. We hold that Cordero substantially complied with the condition that he furnish a guarantee, and that the lease agreed on by the parties went into effect on November 1, 1940. If need be, a formal guarantee may now be executed.

Our conclusion as to the intention of the parties is fortified by the above-described conduct of both parties since November, 1940 (see §1234, Civil Code, 1930 ed.). It was only when Abarca suddenly decided that he preferred to have possession himself of one portion of the property under lease to Cordero that the pretext that no formal guarantee had as yet been executed in connection with the new lease was seized upon to justify ouster of Cordero on the ground that he was only a month-to-month tenant. Abarca never disclosed this theory until this suit was filed. Zacour was permitted, if not induced, to make his extensive expenditures on the annex on the theory that Cordero had a lease for a fixed term and that Zacour's tenure as Cordero's sublessee for a fixed term was consequently assured. And the rent under the new lease was paid by Cordero for seven months and accepted by Abarca without protest. There was no insistence by Abarca that the formal execution of the guarantee be expedited, or even any mention thereof. Even the letter of May 14, 1941, which is set forth in the complaint as the basis of the suit for unlawful detainer, refers

514

only to the first floor of the Comercio St. portion of the building and then only asks for evacuation for repairs, without demanding permanent possession thereof. While it is true that no previous demand is necessary to justify a suit for unlawful detainer against a month-to-month tenant (§1471, Civil Code, 1930 ed.; *Toro* v. *Pizá Brothers, Ltd.*, 30 P.R.R. 70), the text of that letter is of assistance in weighing the conduct of the parties in order to determine their intention.

There is likewise no basis for any contention that the lease itself did not take effect because it had not as yet been reduced to writing. "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . . . ". Restatement, Contracts, Section 26. Indeed, Section 1231, Civil Code, 1930 ed., provides that "Should the law require the execution of an instrument or other special formality in order to make the obligations of a contract binding, the contracting parties may compel each other to comply with said formalities from the moment in which consent and the other requirements, necessary for their validity, have taken place."

This is not to say that the parties may not agree that legal obligations between them shall be deferred until the writing is made. Their intention in that respect is paramount. In this case, after examining all the recited circumstances, we hold that the parties intended the writing merely to record an already operative contract. Cf. 47 Harv. L.R. 873.

The district court found that the case was "devoid of proof" that a lease for a fixed term existed. The lower court may have been under the impression that such phraseology by it was necessary in this case, on the theory that if there was a substantial conflict in the evidence, a suit for unlawful detainer was not the proper remedy. Indeed, the

appellant himself has asked us to reverse the judgment on the ground that such a conflict exists. But that theory finds no basis in the decisions of this court. Our cases hold that a serious conflict on the question of title is a bar to an unlawful detainer suit. But here there is no dispute as to title. On the contrary, both parties agree that Celestina Abarca owns the property. The dispute herein revolves around the right to possession, based on an alleged lease for a fixed term. Even though there be a serious conflict in the evidence as to the existence of such a lease, a suit for unlawful detainer is the appropriate form of action to resolve that dispute. This is because the very issue to be decided in an unlawful detainer suit is the right to possession. *Maceira* v. *Pietri*, 30 P.R.R. 545.

The judgment of the district court will be reversed and a judgment will be entered dismissing the complaint with costs.